## In re AMES DEPARTMENT STORES, INC., et al., Debtor.

### Hannaford Bros. Co., Plaintiff,

### v.

### Ames Department Stores, Inc., Ames Realty II, Inc., The Stop & Shop Supermarket Co. LLC, Vickerry Realty Co. Trust, and Coliseum Vickerry Realty Co. Trust, Defendant.

**Bankruptcy No. 01–42217 (REG).**
**Adversary. No. 04–2829.**

United States Bankruptcy Court,
S.D. New York.

Oct. 14, 2004.

---

See also 287 B.R. 112.

Pierce Atwood, by Jacob A. Manheimer, (argued), Portland, ME, for plaintiff.

White & Case, by Felix J. Lopez (argued), Frank L. Eaton, Miami, FL, for defendant.

Weil, Gotshal & Manges LLP, by Timothy Karcher, (argued), New York, NY, for debtor-defendant.

Posternak, Blankstein & Lund LLP, by Robert O. Resnick, (argued), Boston, MA, for nominal defendants.

Otterbourg, Steindler, Houston & Rosen, P.C., by Todd M. Goren (argued), New York, NY, for the Official Committee of Unsecured Creditors.

## DECISION ON MOTION FOR SUMMARY JUDGMENT

ROBERT E. GERBER, Bankruptcy Judge.

This adversary proceeding arises under the umbrella of the jointly administered chapter 11 cases of debtor Ames Department Stores and its affiliates ("Ames"), one of the defendants in this action. A second defendant, the Stop & Shop Supermarket Company ("Stop & Shop") acquired the right, by earlier order of this Court, to take over Ames's tenant interest in the lease (the "Ames Lease") of an Ames store in Nashua, New Hampshire (the "Ames Store"), situated on a tract that was developed as part of a "community shopping center." Plaintiff Hannaford Bros. Co. ("Hannaford") is the operator of a supermarket on an adjacent tract that likewise was said to be part of that shopping center.

Stop & Shop proposes to operate the former Ames Store as a supermarket on the adjacent tract. But Hannaford points to a "Deed of Declaration" (the "Declaration"), initially executed in 1972 and thereafter amended in 1994 to provide additional protection for Hannaford, which imposes restrictions that, by the Declaration's terms, run with the land, so long as a shopping center is operated on the land subject to the Declaration. The Declaration expressly prohibits the operation of a competing supermarket on the site of the Ames Store, so long as Hannaford continues to operate a supermarket on its parcel—which Hannaford, without dispute, now does. In its adversary complaint, Hannaford seeks a ruling from this Court enforcing the Declaration, and ruling that a competing supermarket cannot be operated on the site of the Ames Store.

Hannaford now moves for summary judgment in its favor. In opposition, Stop & Shop does not dispute the existence of

the Declaration, or what it says. But Stop & Shop, joined by Ames (which supports Stop & Shop in this action), opposes summary judgment, principally contending that the requirement for operating a "shopping center" has not been satisfied. Stop & Shop and Ames contend, as their main argument, that in determining whether what was said to be a "shopping center" is in fact a "shopping center" (and thus whether the Declaration runs with the land), this Court may construe the Declaration only after a factual inquiry. They argue that the Court should not focus on the intent of the Declaration's signatories when they drafted the Declaration in 1972, as would be appropriate under New Hampshire law. Instead, Stop & Shop and Ames argue that this Court should decide whether the "shopping center" is such only after applying criteria (involving a weighing of factual factors) that evolved in the federal courts after the enactment of the Bankruptcy Code's 1984 "Shopping Center Amendments" for use in determining whether premises are subject to additional federal requirements that are applicable to premises in a "shopping center" under section 365(b)(3) of the Code. Application of the standards laid out in that federal caselaw, they argue, raises issues of fact.

Then Ames (but not Stop & Shop) makes a number of additional arguments to defeat the enforceability of the Declaration, including contentions that Hannaford lacks standing to protect its interests here; that Hannaford's claims are untimely; that the Declaration, by reason of its inclusion of an alleged "condition subsequent," is incapable of running with the land under New Hampshire law; and that under section 365(f) of the Code and caselaw decisions that invalidate so called "anti-assignment clauses," the Declaration is unenforceable, because it is "tantamount" to an anti-assignment clause.

For reasons set forth more fully below, the Court rules that:

(1) Hannaford has standing here to protect its interests;

(2) Hannaford's objection was timely;

(3) the Declaration does indeed run with the land and is enforceable under New Hampshire law;

(4) in determining what the Declaration's signatories intended when it was executed in 1972, federal criteria that were created and applied years later, and for a different purpose, are not applicable, and that, as a matter of law—state law—the requirement for operation of a "shopping center" continues to be satisfied; and

(5) the Declaration is not an unenforceable anti-assignment provision under section 365(f) of the Code.

On none of these matters is there a material disputed issue of fact. Accordingly, Hannaford's motion is granted.

*Facts*

Though Stop & Shop and Ames assert that if their legal contentions are accepted, material disputed issues of fact exist, the core facts are undisputed.

*Background*

Until it became clear, in the course of its chapter 11 case, that Ames could not successfully reorganize as an ongoing business and would have to liquidate, Ames was a discount retailer, operating hundreds of stores in leased premises. Its store leases—many of which were executed years ago in environments of lower rental rates—had substantial value, and an important aspect of the Ames chapter 11 case has been its efforts to derive value from its store leases by "assume and assign" transactions following the sale of

leases or of the rights to designate leases for "assume and assign" transactions.

After Ames's sale of such "designation rights" was approved by this Court, Ames sought to assume and assign the lease for its store in Nashua, New Hampshire to defendant Stop & Shop. Stop & Shop wishes to develop and operate a "prototypical Stop & Shop superstore"—which means, as a practical matter, a competing supermarket.

### Execution of the Declaration in 1972

The Ames store is situated on one of two tracts of land that originally constituted a single tract (then called "Tract # 2"), which, along with still another tract ("Tract # 1"), were developed in 1972, when the Declaration was initially drafted and recorded. On October 20, 1972, the holders of the interests in the real property covered by the Declaration—Vickerry Realty Co. Trust ("Vickerry"), Coliseum Vickerry Realty Co. Trust ("Coliseum"), and Fleurette D. Fournier, as trustee—signed the Declaration in an effort to develop Tracts # 1 and # 2 as an integrated shopping center.[1] The stated purpose of the Declaration was to facilitate the development of Tract # 1 and Tract # 2 as a "community shopping center" by subjecting the tracts to certain easements, restrictions and obligations pursuant to a "general scheme or plan."[2]

The recitals to the Declaration stated that Vickerry was the owner of 33 acres of land on the east side of Coliseum Avenue in Nashua (Tract # 1),[3] and that Coliseum was the holder of the lessee interest in real estate (of an unstated size) on the west side of Coliseum Avenue (Tract # 2).[4] The recitals continued by establishing a defined term: the "Entire Premises," which as thereafter used would refer to Tract # 1 and Tract # 2 jointly.[5]

The recitals went on to provide that "Vickerry and Coliseum propose to improve the *Entire Premises* as a community *shopping center*," and that the declarants desired to create and establish "certain easements, restrictions and obligations, pursuant to such general plan or scheme, with respect to such *Entire Premises*,"[6] *i.e.*, Tracts # 1 and # 2. One of those restrictions, set forth in Paragraph 7 of the Declaration, provided in substance that the owners would not use any portion of the building areas that were portions of the Entire Premises, or lease such or permit their use, for any entity that would violate "an exclusive business right, a limitation on competition or use, or any restriction upon co-tenancy now contained in any lease of the Building Areas, without the prior written consent of the tenant or tenants ... under all such leases containing any such limitation or restriction."

And the Declaration further provided, in relevant part:

That the easements, restrictions, benefits and obligations hereunder shall create mutual and reciprocal benefits and servitudes upon the Entire Premises,

---

1. Hannaford Statement of Undisputed Material Facts ("HSMF") ¶¶ 6–8.

2. HSMF ¶ 9. The quotes are from the third recital to the Declaration, at 1.

3. Declaration recitals at page 1.

4. *Id.* Coliseum held its interest under a long term ground lease (covering Tract # 2 and other land not subject to the Declaration)

under which Fournier was lessor. Vickerry and Coliseum, while named as nominal defendants in this adversary proceeding, support plaintiff Hannaford on this motion.

5. *Id.* ("[B]oth of the above-described premises jointly to be hereinafter called the 'Entire Premises.' ").

6. *Id.* (emphasis added).

running with the land thereof, and which shall continue so long as Coliseum and/or Vickerry, their heirs, administrators, executors, successors or assigns shall operate a shopping center upon the Entire Premises.[7]

In 1972, a shopping mall called the Nashua Mall was built on Tract # 1.[8] The Ames Store was built in or about 1972, on Tract # 2.[9]

*Hannaford's Purchase of Tract # 2–A in 1994*

In 1994, Hannaford became interested in acquiring an undeveloped portion of Tract # 2 in order to develop and operate a supermarket.[10] Thereafter, Vickerry and Hannaford reached an agreement on this acquisition, and in December 8, 1994, this transaction closed.[11] On that date, Vickerry conveyed a portion of Tract # 2—what is now designated as Tract # 2–A—to Hannaford, in fee.[12] Hannaford's agreement to purchase this parcel was conditioned upon obtaining assurance from Vickerry that no other entity would be permitted to develop or operate a supermarket business on either Tract # 1 or the remainder of Tract # 2—what is now designated as Tract # 2–B.[13]

Vickerry provided this assurance by adopting and having Coliseum adopt and record a Third Amendment to the Declaration (the "Third Amendment") on December 8, 1994.[14] The Third Amendment doc-umented the division of Tract # 2 into Tract # 2–A (the portion to be sold to Hannaford) and Tract # 2–B (upon which the Ames Store rests).[15] Further, the Third Amendment, in its Paragraph 4, also amended Section 7 of the Declaration. The Third Amendment added, immediately after the portion of Paragraph 7 quoted above, in relevant part:

> Notwithstanding anything in the foregoing paragraph [the part of the original Paragraph 7 quoted above], or elsewhere in this Deed of Declaration, to the contrary, Tract # 2–A [the tract acquired by Hannaford] may be used for the operation of a retail supermarket business.... [16]

And significantly for the purposes of this dispute, the Third Amendment then went on to say (again in relevant part):

> [S]o long as Tract # 2–A is thereafter being used for the operation of a retail supermarket business ... no part of the Entire Premises, other than Tract # 2–A, shall be permitted to be occupied or used for (i) the operation of a food supermarket.... [17]

The Third Amendment concluded by saying that except as specifically set forth in the Third Amendment, the provisions of the Declaration remained unchanged, and in full force and effect.

Vickerry expressly referred to the Declaration in the deed conveying Tract # 2–A

---

7. *Id.* ¶ 13.

8. Stop & Shop Answer at 6.

9. *Id.*

10. HSMF ¶ 15.

11. HSMF ¶ 16.

12. *Id.*

13. HSMF ¶ 18.

14. HSMF ¶ 21. The First and Second Amendments to the Declaration are not material to this dispute.

15. HSMF ¶ 20.

16. HSMF ¶ 21.

17. *Id.;* Third Amendment ¶ 4. Hannaford has referred to this use restriction as the "Supermarket Use Restriction," and this Court will too.

to Hannaford. Vickerry conveyed Tract # 2–A to Hannaford "subject to and together with the benefit of the rights, obligations, easements, covenants and restrictions contained in [the Declaration]," [18] which, included, of course, the Supermarket Use Restriction. Upon purchasing Tract # 2–A, Hannaford developed a supermarket (the "Hannaford Store"), which Hannaford continues to own and operate.[19]

*The Ames Lease*

Before Ames occupied it, the Ames Store was leased by Montgomery Ward, and was in the portion of Tract # 2 that was redesignated in 1994 as Tract # 2–B.[20] Before Hannaford's acquisition of Tract # 2–A closed, Vickerry provided Montgomery Ward with notice of the terms of the Hannaford transaction, including, in particular, the adoption of the Supermarket Use Restriction.[21] Montgomery Ward, in turn, consented to the Third Amendment and entered into a Common Operating Agreement with Hannaford, expressly agreeing to abide by the Supermarket Use Restriction.[22]

The Ames Lease was executed on or about October 28, 1999. Section V.1(b) of the Ames Lease expressly incorporated the restrictions and covenants set forth in the Declaration, stating that the lessee could change the use of the leased premises provided that the principal use "shall not conflict with . . . any then existing restrictive covenants regarding the use of the Shopping Center, the Premises or the Common Areas." [23] At the time Ames entered into the Ames Lease, Ames had at least constructive notice of the Supermarket Use Restriction, as it was duly recorded in the county Registry of Deeds.[24]

On December 2, 2002, Ames sought an order from this Court approving Ames's sale to Stop & Shop of the rights to designate whether a number of Ames's unexpired leases (including the one in controversy here) would be rejected or assumed and assigned in accordance with a "Designation Rights Agreement," pursuant to which Stop & Shop paid Ames $20 million and other consideration.[25] This Court granted that motion shortly thereafter.[26] Thereafter, pursuant to a Notice dated June 30, 2003 (the "Assignment Notice"), Ames, at Stop & Shop's request, notified Hannaford, Vickerry and Coliseum of the proposed assignment to Stop & Shop, and of the use to which Stop & Shop proposed to develop the Ames Store.[27] Hannaford then filed an objection to the Notice, and commenced this action.

*Discussion*

*I.*

*Summary Judgment Standards*

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

---

18. HSMF ¶¶ 16, 25.

19. HSMF ¶ 32.

20. HSMF ¶ 28.

21. HSMF ¶ 29.

22. HSMF ¶¶ 29–31.

23. HSMF ¶ 35. "Shopping Center," as defined in the Ames Lease in Article I at page 1 (a definition for "Shopping Center" that is not necessarily the same as that of "Shopping Center" in the Declaration), included the "Project" and the Building in which the "Premises" were located, "including all structures, parking facilities, grounds and other improvements build thereon, as the same may hereafter be built out or changed from time to time . . . ," and also the entire Nashua Mall.

24. HSMF ¶ 36.

25. HSMF ¶ 37.

26. HSMF ¶ 38.

27. HSMF ¶¶ 39–40.

terrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[28] The moving party bears the initial burden of showing that the undisputed facts entitle the movant to judgment as a matter of law.[29] Then, if the movant carries this initial burden, the nonmoving party must set forth specific facts to show there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[30]

In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[31] A fact is material if it "might affect the outcome of the suit under the govern-

ing law." [32] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [33]

## II.

### Threshold Matters

Ames makes a number of arguments that might be regarded as threshold matters. The Court addresses them first.

### A.

### Standing

■ Ames initially argues that Hannaford lacks standing to protect its interests in this controversy.[34] The Court cannot agree. Ames disregards the unquestioned ability of the signatories to deeded restrictions,[35] and their successors in interest, to enforce them under New Hampshire law.[36]

**28.** Fed.R.Civ.P. 56 (made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056).

**29.** *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Ferrostaal, Inc. v. Union Pacific R. Co.,* 109 F.Supp.2d 146, 148 (S.D.N.Y.2000) (The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact ....").

**30.** Fed.R.Civ.P. 56(e); *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 529 (Bankr.S.D.N.Y.2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

**31.** *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (holding that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257

F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) ("We ... constru[e] the evidence in the light most favorable to the nonmoving party.").

**32.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**33.** *Id.*

**34.** Ames Br. at 20–21.

**35.** At least as relevant here, the Court regards "restrictive covenants," when recorded or in deeds, and "deeded restrictions" as interchangeable. Because restrictive covenants historically were often used for improper purposes, having nothing to do with this controversy, the Court prefers to use the expression "deeded restrictions" here.

**36.** *See Traficante v. Pope,* 115 N.H. 356, 341 A.2d 782, 784 (1975) ("Promises imposing restrictions on the use of land may be enforced at law and in equity between the original parties and their successors depending on the nature of the promise itself and on the type of relief requested.").

Ames's reliance on *In re Martin Paint Stores*[37] is misplaced. There, a clothing retailer tenant in a building where a debtor had a lease objected to the assignment of a debtor's lease to another clothing retailer, based on an anti-competition provision in its own lease with the common landlord, and on a "use clause" within the debtor's own lease that would be violated if the assignment occurred.[38] The *Martin Paint Stores* landlord itself did not object, and the district court, affirming the bankruptcy court, found that the objecting neighbor tenant did not have standing to object to the assignment because the neighbor tenant's only legal rights were against the landlord directly.[39] While the *landlord* would have had standing to object to the assignment, the neighbor tenant could not establish standing by "raising another person's legal rights."[40]

Here, by contrast, Hannaford is not seeking to "rais[e] another person's legal rights"; it is seeking enforcement of its own. *Martin Paint Stores* is inapplicable for that reason. Hannaford has standing to enforce whatever legal rights it has.

## B.

### *Timeliness*

■ Ames also argues, though not at length, that in December 2002, Ames "sold the right to designate the Lease to Stop & Shop free and clear of any liens, claims, encumbrances, or interests in such property, including Hannaford's claims," under the Designation Rights Agreement. Ames goes on to argue that because none of Vickerry, Coliseum or Hannaford objected

to the Designation Rights Order, Hannaford's objections to the actual assignment (in which Vickerry and Coliseum join) are untimely.[41] Once more, the Court cannot agree.

Ames relies on the portion on the Designation Rights Order that assertedly provided that:

[P]ursuant to section 363(f) of the Bankruptcy Code, the sale of any Lease to any Designee shall be free and clear of all liens, claims, encumbrances, and interests, ... with such liens, claims, encumbrances, and interests to attach to the proceeds of the sale....[42]

But the portion quoted by Ames is not complete. Ames fails to address the portion of the order that continued with an exception for "Permitted Exceptions." The "Permitted Exceptions," as defined in the Designation Rights Agreement, included "covenants, conditions *and restrictions of record,* which do not prevent in any material way, prohibit or materially impair the use of the Properties for their *existing* uses and purposes."[43] The "existing uses" included, of course, the operation of a department store, and the "existing purposes" included operations within the shopping center that were being conducted on the Entire Premises, and which, under the Declaration, included both Tract #1 and Tract #2. Hannaford did not then have to anticipate that Stop & Shop or Ames would exceed the authority they had under the Court's order. Additionally, Hannaford was not (and is not) seeking an interest (or lien, claim or encumbrance) in

37. 207 B.R. 57 (S.D.N.Y.1997).

38. *Id.* at 59.

39. *Id.* at 61–63.

40. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

41. Ames Br. at 6.

42. Designation Rights Order at 7.

43. Designation Rights Agreement at 3 (emphasis added).

the Ames lease; it has merely been seeking to enforce the use restriction with respect to Tract # 2–B, which is an element of, and limited, Ames's property interest in the first place.

Hannaford had no occasion to object under such circumstances, and its failure to object to the Designation Rights Order is immaterial to the claims Hannaford asserts now.[44]

## III.

### Enforceability of the Declaration

The Court now turns to the substantive matter that is the enforceability of the Declaration before considering the extent, if any, to which enforceability is trumped by the statutory provisions of the Bankruptcy Code.

### A.

### Covenant Running With the Land

 Under New Hampshire state law, a covenant in a deed is an agreement to either do or not do particular acts with respect to land.[45] To enforce the terms of a restrictive covenant, a plaintiff must show "that the benefit or burden of the promise was intended to run with the land, that the promise substantially altered the legal relations of the parties with respect to the land (i.e. the promise must 'touch and concern' the land), and that a succession of interest existed between the promisor and the promisee."[46] If these requirements are satisfied, the benefit of the covenant is said to run with the land, and the landowner of a parcel benefited by the covenant may enforce its terms.[47]

 Under New Hampshire law, intent to benefit or burden a parcel of land is to be ascertained from the language of the instrument imposing the use restriction, the conduct of the parties and other surrounding circumstances.[48] The inclusion of use restrictions in deeds conveying property is a clear way for the parties to manifest their intent to create a covenant that runs with the land.[49] Although the burden of establishing that the Declaration was intended to run with the land is upon Hannaford, and it should not be implied upon doubtful evidence,[50] in this case there is no doubt whatsoever as to the grantors' intent that it run with the land. The intention that the Declaration run with the land, so long as its requirements were

---

**44.** Stop & Shop asserted as an affirmative defense in its Answer, though not on this motion, that the Designation Rights Order provided it with a substantive defense to Hannaford's claims. See Answer at 7–8. For the reasons just stated, the Court disagrees.

**45.** See Arnold v. Chandler, 121 N.H. 130, 428 A.2d 1235, 1237 (1981).

**46.** Traficante v. Pope, 115 N.H. 356, 341 A.2d 782, 784 (1975).

**47.** Id.

**48.** See id., 341 A.2d at 785; Carroll v. Schechter, 112 N.H. 216, 293 A.2d 324, 326 (1972); Bouley v. City of Nashua, 106 N.H. 74, 205 A.2d 34, 37 (1964).

**49.** See Nashua Garden Corp. v. Gordon, 118 N.H. 379, 386 A.2d 1278, 1280 (1978) ("[I]ntent that they run with the land is further evidenced by the inclusion of the restrictions in the deeds from Fournier as trustee."); DeBlois v. Crosley Bldg. Corp., 117 N.H. 626, 376 A.2d 143, 145 (1977) (finding that the parties to a conveyance of land intended for a covenant to run with the land based on inclusion of the restrictions in the deed).

**50.** See Sun Valley Beach, Inc. v. Watts, 98 N.H. 428, 102 A.2d 504, 507 (1954) (finding that the burden of proving the existence of a restrictive covenant lies on the party that is asking the Court to enforce it).

satisfied, was explicit and unequivocal.[51]

But Ames argues, notwithstanding the language of the Declaration and of the deed to Hannaford expressly referring to the Declaration, that the Supermarket Restriction does not run with the land under New Hampshire law. That is so, Ames argues, because the Supermarket Restriction assertedly is "dependent on fulfilling a condition subsequent"—*i.e.*, requiring operation of a shopping center upon the Entire Premises.[52] The Court once more disagrees. The Declaration does not have a condition subsequent, in that respect or in any other, and even if the Declaration were deemed to have one, that would not trump the unambiguous stated intention of the Declaration's signatories.

■ Ames cited no New Hampshire case law in its brief or at oral argument to support its argument that the language of the Declaration created a condition subsequent, and the Court disagrees that one exists here. "A condition subsequent is something that, if it occurs, will bring something else to an end." [53] That is not what is present here. Of course it is true that if the requirements of the Declaration were not satisfied, the Declaration could not be enforced, but the Declaration was conspicuously silent in providing for a reversion, for a discharge of a duty of performance, or for any other consequence if the condition of failure to satisfy the Declaration's requirements were not satisfied. Satisfaction of the requirements of the Declaration was a condition precedent to the Declaration's enforcement, but the failure to satisfy the Declaration's requirements did not create a condition subsequent.

Additionally, assuming, *arguendo*, that the requirement for operation of a shopping center upon the Entire Premises were deemed to create a condition subsequent, that would not provide a sufficient basis for undermining an expressly stated intention by the Declaration's signatories that the Declaration run with the land. Ames's reliance on *Nashua Hospital Ass'n v. Gage*[54] is misplaced. While the *Gage* court began by setting forth a supposed principal of law upon which Ames relies,[55] the *Gage* court ultimately dismissed that approach and held that the restriction *did* run with the land—but had been abandoned.[56] At the risk of stating the obvious, the Court observes that in order for the restriction to have been abandoned, it

**51.** *See supra,* note 7 and accompanying text ("[T]he ... restrictions ... hereunder shall create mutual and reciprocal benefits and servitudes upon the Entire Premises, *running with the land thereof* ....") (emphasis added).

**52.** Ames Br. at 21. The argument appears at Ames Br. at 16–17.

**53.** Bryan A. Garner, *A Dictionary of Modern Legal Usage,* 197 (2d ed.1995). *Accord Black's Law Dictionary,* 289 (7th ed. 1999) ("A condition that, if it occurs, will bring something else to an end; an event the existence of which, by agreement of the parties, discharges a duty of performance that has arisen.").

**54.** 85 N.H. 335, 159 A. 137 (1932).

**55.** The portion of the decision cited by Ames stated:

[W]here the agreement is stated as a preamble to a condition subsequent, based upon restrictions upon the use of property conveyed and with a provision for a forfeiture to the grantor and his heirs, there is nothing which runs with the land, and the rights against the grantee are only such as are personal to the grantor and his heirs.

159 A. at 139. It should be noted in this connection, supplementing observations above with respect to whether or not a condition subsequent exists here, that the Declaration here does not include a provision "for a forfeiture to the grantor and his heirs," or, for that matter, to anyone.

**56.** *Id.,* 159 A. at 141.

must have been in effect at one point, even if the restriction had been (as there, but not here) paired with a condition subsequent that provided for a defeasible fee— i.e., for forfeiture of the entire interest of the property upon non-occurrence of the condition.[57]

Finally, the New Hampshire courts have moved away from rigidly imposing requirements for the enforcement of deeded restrictions, as they have come to recognize the value of deeded restrictions as land use planning devices.[58] The New Hampshire cases no longer support the notion, if they ever did, that a stated intention that a deeded restriction run with the land becomes void simply because it can be enforced only when its requirements are satisfied.

The Court concludes, accordingly, that the covenants in the Declaration *did* run with the land, and could be enforced so long as the Declaration's requirements were satisfied.

## B.

### Satisfaction of the Declaration's Requirements

The Court then must determine whether material issues of fact exist as to whether the Declaration's requirements were satisfied. Stop & Shop and Ames base their opposition on contentions that disputed material issues of fact exist as to whether

a "shopping center" is still being operated on the "Entire Premises." In this connection, they make two arguments. They first urge the Court to march through the multi-factor test articulated by the Third Circuit in the 1990 case of *In re Joshua Slocum Ltd.*,[59] a case construing rights under section 365 of the Bankruptcy Code, to determine if what is being operated upon the "Entire Premises" is a "shopping center." They additionally urge the Court to look to certain events years after the drafting of the Declaration, where the expression "shopping center" was used, though in a wholly different context. Neither point is persuasive.

### 1.

### The Joshua Slocum Argument

■ The first of the two Stop & Shop/Ames arguments rests on the notion that New Hampshire state law should be disregarded, and that the Court should instead look to federal caselaw that came down years later, for an entirely different purpose. Hannaford disputes that premise, and the Court agrees with Hannaford.

In 1984, Congress enacted major amendments to the Bankruptcy Code and other bankruptcy-related provisions of federal law,[60] which included, among a fair number of other things, amendments to section 365 of the Code.[61] The amendments to section 365 emerged from legislation

---

**57.** Since Vickerry conveyed Tract # 2–A to Hannaford in fee simple and not through a defeasible fee, *Gage* is also factually distinguishable on this basis.

**58.** *See Joslin v. Pine River Dev't Corp.*, 116 N.H. 814, 367 A.2d 599, 601 (1976) ("The former prejudice against restrictive covenants which led courts to strictly construe them is yielding to a gradual recognition that they are valuable land use planning devices."); *Traficante v. Pope*, 115 N.H. 356, 341 A.2d 782, 784 (1975) ("Restrictions on the use of land by private parties have been particularly im-

portant in the twentieth century when the value of property often depends in large measure upon maintaining the character of the neighborhood in which it is situated.").

**59.** 922 F.2d 1081 (3d Cir.1990).

**60.** *See* The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

**61.** *Id.* sec. 362.

first introduced by Senator Hatch to address problems perceived by shopping center landlords and solvent tenants concerning the bankruptcies of other tenants.[62] Those amendments are frequently referred to as the "Shopping Center Amendments." The amendments to section 365 included, as relevant here, amendments to section 365(b)(3) and 365(h) that applied only to leases of real property in a shopping center.

But neither Bankruptcy Code section 365, nor Bankruptcy Code section 101 (which sets forth definitions for terms used elsewhere in the Code) defined "shopping center."[63] "Rather, the proper definition of this term '[was] left to case-by-case interpretation.' "[64] To deal with the omission in the statutory drafting process, the Third Circuit, in its 1990 decision in *Joshua Slocum*, articulated a multi-factor test for determining what is a "shopping center" within the meaning of section 365(b)(3) of the Code. The factors set forth in *Joshua Slocum* and its progeny are regularly used by bankruptcy courts in determining whether or not premises are a "shopping center" when disputes arise as to that issue under section 365(b)(3).

But neither Stop & Shop nor Ames offers any case law or rationale to support the notion that the *Joshua Slocum* standards, created to fill a statutory gap with respect to the meaning of "shopping center" in federal determinations under section 365 of the Code, are appropriate for a wholly different determination, under state law, as to the construction of a deed—particularly one executed 18 years before *Joshua Slocum* was decided, and 12 years before the Shopping Center Amendments even came into being. To the contrary, it is clear to the Court that the matter of construction of the Declaration, whether deemed to raise issues of contract law or of property law, is a matter of *state* law.

To the extent that the construction of the Declaration is a matter of contract interpretation—in this case, construction of a deed—it is plainly governed by state law. "When a bankruptcy court adjudicates a dispute arising from a contract claim, it must apply state law unless the bankruptcy code provides otherwise."[65] Likewise, if the Court regards construction of the Declaration as a matter of property law, once more state law, and not federal law, applies. As the United States Supreme Court held in its familiar decision in *Butner v. United States*:[66]

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by

---

62. *See* 130 Cong.Rec. S8895 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* App. E Collier on Bankruptcy, at App. Pt. 6–173 (Lawrence P. King et al. eds., 15th ed. rev.2001).

63. *See Joshua Slocum*, 922 F.2d at 1086.

64. *Id.* (quoting *In re Goldblatt Brothers, Inc.*, 766 F.2d 1136, 1140 (7th Cir.1985)).

65. *In re New England Fish Co.*, 749 F.2d 1277, 1280 (9th Cir.1984); *In re Sparkman*, 703 F.2d 1097, 1099 (9th Cir.1983); *In re Wingspread Corp.*, 145 B.R. 784, 787 (S.D.N.Y.1992) (Leval, J., then a district judge) (quoting *New England Fish Co.*).

66. 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

reason of the happenstance of bankruptcy."[67]

Indeed, bankruptcy courts look to state law even for the purpose of determining what is property of the estate under Bankruptcy Code section 541, a federal statutory provision. As noted in *Butner*, with the exception of Bankruptcy Code provisions dealing with fraudulent conveyances and preferences, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."[68] That should, at the least, be no less true when bankruptcy courts are asked to determine the property rights of non-debtors.

 Finally, the notion of applying interpretative standards that came into being years after the drafting of the instrument to be construed is particularly illogical. That is squarely inconsistent with the direction of the New Hampshire Supreme Court: "When interpreting a contract, we focus on the intent of the contracting parties *at the time they entered into the agreement*."[69]

Thus the Court rules that in determining what the Declaration's signatories intended when the Declaration was executed in 1972, federal criteria created and applied years later, and for a different purpose—interpretation of Bankruptcy Code section 365(b)(3)—are not germane.

## 2.

### Standards For Construction of the Declaration Under New Hampshire Law

New Hampshire's interpretive rules with respect to the construction of the Declaration are straightforward.

 Under New Hampshire state law, the proper interpretation of a contract, such as a deed,[70] is a question of law for the court.[71] When interpreting a contract, as previously noted, the court's focus must be on the intent of the contracting parties at the time they entered the agreement.[72]

 In reaching the proper interpretation, the court must determine the common meaning of the words and phrases used based on the understanding that a reasonable person would attach to them.[73] If the language of the contract is clear and unambiguous, the court must interpret it without resort to any sort of extrinsic evidence.[74] The New Hampshire Supreme Court has further stated, in this connection:

> To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical ar-

**67.** *Id.* at 55, 99 S.Ct. 914 (quoting *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961)).

**68.** *Id.* at 54, 99 S.Ct. 914.

**69.** *West v. Turchioe*, 144 N.H. 509, 761 A.2d 382, 387 (1999) (emphasis added).

**70.** While the Declaration is, technically speaking, a deeded (and recorded) restriction and not a conveyance as such, neither Stop & Shop nor Ames contends that such a distinction is relevant.

**71.** *Baker v. McCarthy*, 122 N.H. 171, 443 A.2d 138, 140 (1982); *Catamount Constr., Inc. v.*

*Town of Milford*, 121 N.H. 781, 435 A.2d 123, 124 (1981).

**72.** *See supra*, notes 56–61, 63 and accompanying text.

**73.** *Murphy v. Doll–Mar, Inc.*, 120 N.H. 610, 419 A.2d 1106, 1108 (1980); *Kilroe v. Troast*, 117 N.H. 598, 376 A.2d 131, 133 (1977).

**74.** *See Petition of Rattee*, 145 N.H. 341, 761 A.2d 1076, 1080 (2000); *Flanagan v. Prudhomme*, 138 N.H. 561, 644 A.2d 51, 60 (1994).

rangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it.[75]

 The New Hampshire cases further provide that in its search for the interpretation that will best reflect the parties' intention, a court should consider "the written agreement of these parties, all of its provisions, its subject matter, the situation of the parties at the time, and the object intended."[76] Where various documents together constitute the contract between the parties, the parties' intent must be ascertained from all the instruments read together as a whole.[77] In interpreting a multiple document agreement, a court must harmonize the provisions of various documents so that none will be rendered meaningless.[78]

### 3.

### Application of the New Hampshire Interpretive Standards

Applying these principles to the facts of this case, the Court finds no material issues of fact with respect to the enforceability of the Declaration. As an initial matter, there is no ambiguity as to what the parties meant when the Declaration referred to the "Entire Premises." They expressly defined "Entire Premises" to consist of Tracts # 1 and # 2—the latter of which was later subdivided into Tract # 2–A and Tract # 2–B with the Third Amendment.

However, the term "shopping center" was not likewise expressly defined in the Declaration, so it is instead necessary to determine whether it is unambiguous, or, if not, to construe it by other means.

 Under New Hampshire law, a court is to look to the intended purpose of the Declaration in accordance with the common meaning of the language used, and the meaning that would be attributed to it by a reasonable person.[79] Applying that standard, the Court does not find "shopping center" to be in any way ambiguous, and finds no basis for concluding that what was referred to as a shopping center in 1972 ceased to be such in 1994 or 2004. The definition of "shopping center" argued by Hannaford, "a group of retail stores and service establishments," based on the common definition of that term,[80] is consistent with both the plain meaning of

**75.** *New Hampshire Municipal Trust Workers' Compensation Fund v. Flynn*, 133 N.H. 17, 573 A.2d 439, 441–42 (1990).

**76.** *Thiem v. Thomas*, 119 N.H. 598, 406 A.2d 115, 118 (1979) (quoting *Griswold v. Heat Inc.*, 108 N.H. 119, 229 A.2d 183, 186 (1967)).

**77.** *Bellak v. Franconia College*, 118 N.H. 313, 386 A.2d 1266, 1268 (1978).

**78.** *West v. Turchioe*, 144 N.H. 509, 761 A.2d 382, 387 (1999).

**79.** *See Murphy v. Doll–Mar, Inc.*, 120 N.H. 610, 419 A.2d 1106, 1108 (1980) ("In reaching the proper interpretation we require that the words and phrases used by the parties be given their common meaning, and this court will determine the meaning of the contract based upon the meaning that would be attached to it by a reasonable person.") (internal citation omitted); *Kilroe v. Troast*, 117 N.H. 598, 376 A.2d 131, 133 (1977) ("[T]he contract will be given a meaning that would be attached to it by a reasonable person.").

**80.** *See Webster's New Collegiate Dictionary*, 1072 (1975), a reference work published fairly close in time to the time of the Declaration's execution.

the expression and the meaning that a reasonable person would ascribe to it.

That is particularly so since in or about 1972, retail establishments were constructed on each of Tract # 1 and Tract # 2, and each tract continued to have undeveloped land. The Declaration does not require that a shopping center be operated on the *entirety* of the Entire Premises. Instead, the Declaration's plain meaning is that if a shopping center is operated on any portion thereof, that is sufficient, and even under Stop & Shop's arguments, the Nashua Mall on Tract # 1 satisfies that requirement; just as in 1972, 1994 and 2001, Vickerry continues to own Tract # 1 and continues to lease portions of that parcel to numerous retail stores and service establishments.

But the Court need not even reach that issue. Without factual dispute, retail stores and service establishments continue to be operated on each of the components of the Entire Premises—Tract # 1, Tract # 2–A, and Tract # 2–B—so once more the Declaration would be satisfied even if, contrary to the Court's reading, operation on each of Tract # 1 and Tract # 2 or even on every tract within the Entire Premises were deemed to be required.

Because the Court finds "shopping center" in the Declaration to be unambiguous and to be satisfied based on undisputed facts, it does not need to reach the other indicia of the parties' intent, such as the provisions in the documents as a whole, the subject matter of the Declaration, the situation of the parties at the time, and the object intended. Nor does it have to try to construe the provisions of the Declaration and its amendments to avoid making

any of them meaningless. But if the Court nevertheless engages in such an analysis, the Court likewise must find, without any issue of fact, that a "shopping center" continued to be operated on the Entire Premises.

As noted above, the original purpose of the Declaration was to develop the "Entire Premises" as a "community shopping center" by subjecting the tracts to restrictions pursuant to a "general scheme" or plan.[81] Retail establishments were constructed in or about 1972 on parts of each of Tract # 1 and Tract # 2, while other parts of each tract remained undeveloped. The Declaration's signatories expressly contemplated the construction of more buildings and stores upon the "Entire Premises," and that such would be in furtherance of the general scheme.[82] Similarly, it is clear that the signatories intended for the restrictions and the general scheme to remain in effect whether or not Vickerry or Coliseum owned the entirety of the "Entire Premises"—as the condition referred to (and contemplated) the operation of a shopping center not just by Vickerry and Coliseum, but also by (among others) their successors or assigns. Given this background, it is clear that the Declaration's signatories anticipated—in fact planned— that there would be changes in the use of the property, yet that the signatories would still consider it to be a "shopping center" such that all the restrictions would apply.

But most significant to the Court are the acts of the Declaration's signatories when amending the Declaration after its initial execution in 1972, and the words they used when they did so. Through the amendments to the Declaration, the parties re-

81. HSMF ¶ 9.

82. Declaration fourth recital at page 1 ("WHEREAS, Vickerry and Coliseum have erected and/or will erect various buildings upon, and have set aside for possible future construction certain portions of the Entire Premises....").

peatedly confirmed their belief that a "shopping center" existed, and confirmed their collective desire to keep the restrictions in the Declaration in effect. When Vickerry conveyed Tract # 2–A to Hannaford in 1994, the Declaration was amended with the Third Amendment to include the Supermarket Use Restriction. It would make no sense whatsoever, and would render much of the Declaration meaningless, to say that at the very time the Declaration was amended to accommodate the conveyance to Hannaford, the Declaration signatories intended to take an action—the *end* of the continued operation of a "shopping center"—such that the provisions of the Declaration would no longer remain in effect. These circumstances compel the conclusion that the parties thought a shopping center continued to exist in 1994 at the time of the Third Amendment—even though Tract # 2 would now become Tract # 2–A and Tract # 2–B, and even though a supermarket, on a separate fee parcel, would be operated on Tract # 2–A.

 The Court has been careful, in determining the intent of the Declaration, not to weigh opposing facts, but instead to look to the words used by the Declaration's signatories in 1994 and thereafter. The Third Amendment explicitly stated that "[e]xcept as specifically set forth in this Third Amendment, all the declarations and provisions contained in the Deed of Declaration shall remain unchanged and in full force and effect and are hereby confirmed." [83] The Hannaford Deed specifically provided that the conveyance of Tract # 2–A was subject to "the benefit of the rights, obligations, easements, covenants and restrictions" contained in the Declaration.[84] These matters, particularly collectively, confirm the intent of the parties, since the New Hampshire courts have held that when subsequent deeds expressly make the conveyances subject to the original restrictions, the intent of the parties for the restrictions to run with the land is reaffirmed.[85] When the Third Amendment was executed, the Declaration's signatories thought that a "shopping center" continued to exist, and would continue to exist. Otherwise, the Declaration could not continue "in full force and effect." Accepting the Stop & Shop / Ames argument would require the Court to conclude that the Third Amendment was *void ab initio*. That would be an absurd result.

Likewise, similar language was used at the time of the Fourth Amendment in 2001.[86] The same conclusion is appropriate with respect to that time as well.

The remaining question for the Court, then, is whether the circumstances that existed in 2001—when it was plain that a shopping center was being operated upon the Entire Premises—continue to exist today. There is no evidence to suggest a

---

83. Declaration Third Amendment ¶ 7.

84. HSMF ¶ 25. Indeed, even the Ames Lease—which was executed in 1999, years after the original Declaration was executed and after the conveyance to Hannaford— made reference to the existing deeded restrictions in the shopping center.

85. *See De Blois v. Crosley Bldg. Corp. of Maine, Inc.,* 117 N.H. 626, 376 A.2d 143, 145 (1977); *Traficante v. Pope,* 115 N.H. 356, 341 A.2d 782, 785 (1975).

86. It proceeded:

Except as specifically set forth in this Fourth Amendment to Deed of Declaration all the declarations and provisions contained in the Deed of Declaration shall remain unchanged and in full force and effect and are hereby confirmed. Except as herein specifically provided otherwise, all the declarations, provisions, benefits and burdens contained in the Deed of Declaration as amended hereby, shall be applicable to each and every Owner of a tract in the Entire Premises, and to any successors or assigns thereof.
Declaration Fourth Amendment ¶ 17.

contrary conclusion. Neither Stop & Shop nor Ames introduced any evidence on this motion to suggest that retailing ceased at either the Nashua Mall or the other establishments on Tract #1 or #2, or that their uses changed in any material way—as they might, for example, if the land had ceased to be used for retail purposes, and had become devoted instead to manufacturing or residential uses. While Stop & Shop and Ames spoke of evolutionary changes in the Entire Premises—such as changes in parking arrangements, easements, particular retailers, and particular successors and assigns taking portions in fee—their evidence was significantly devoid of any showing of any change, and particularly, any material change, in the principal use and character of the Entire Premises during the operative periods in this case.

The Court reaches its conclusions well aware that as Stop & Shop states, a piece of Tract #1, another component of the Entire Premises, was conveyed in fee to Home Depot in 2001 for the operation of a Home Depot Store. But the fact that Vickerry conveyed a portion of Tract #1 to Home Depot is not relevant, as Home Depot—aside from being another retailer—clearly was a "successor or assign" of Vickerry's.[87] New Hampshire courts have consistently found that a grantee of a parcel of land is a successor in interest of the grantor.[88]

*4.*

*Reference to Other Leases
and Agreements*

Ames argues that the expression "shopping center" in the original document is ambiguous because the Ames lease, executed 17 years after the original Declaration, contains a different definition of the expression "shopping center"—one which includes the Nashua Mall and the Ames Store, but which does not include the Hannaford Store.[89] Similarly, Stop & Shop argues that since later agreements entered into by Vickerry referred to the "shopping center" as the Nashua Mall on Tract #1 (and not also Tract #2–A, containing the Hannaford Store), Tract #2–A cannot be deemed to be part of the "Entire Premises."[90] Neither argument supports conclusions any different than those set forth in Part III(B)(3) above.

■ As noted, the expression "shopping center," as used in the Declaration in 1972, is unambiguous. But assuming, *arguendo*, that it were not, miscellaneous documents unrelated to the Declaration and executed nearly 20 years later cannot reasonably be found to bear on the signatories' intent with respect to the language they used in the Declaration. Rather, as the Court has noted, the specific things the signatories said *with respect to the Declaration*, at execution and when its various amendments were executed—most significantly, the statements that the Declaration continued "in full force and effect"—must be relied on instead.

Finally, Stop & Shop's contentions miss the mark. The issue is not one of defining the Entire Premises, which, as noted, was explicitly defined in the Declaration as Tract #1 and Tract #2. The issue is

---

**87.** *See, e.g., Black's Law Dictionary* 114, 1446 (7th ed.1999).

**88.** *See Johnson v. Shaw,* 101 N.H. 182, 137 A.2d 399, 402 (1957) (grantee of parcel "is admittedly a successor in interest" of grantor).

**89.** Ames Br. at 10, 18–19.

**90.** Stop & Shop Resp. ¶ 30.

rather whether a "shopping center," as that expression was used in the Declaration, continued to be operated on the Entire Premises. Definitions used in documents unrelated to the Declaration, for different purposes, are not germane to that inquiry.

## IV.

### Effect, if Any, of Code Section 365(f)

As the last of the major objections to enforcement of the Declaration,[91] Ames argues further that even if the Supermarket Use Restriction did run with the land and the lease was subject to it, the Supermarket Restriction is unenforceable under 365(f) of the Bankruptcy Code because it is tantamount to an anti-assignment clause. Once more the Court must disagree.

With exceptions not relevant here, Bankruptcy Code section 365(f) provides, in relevant part:

(1) . . . [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions

the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection. . . .

▉▉▉▉ Section 365(f) performs an important function for maximizing the value in an estate for creditors. It protects the body of creditors as a whole from provisions, typically in leases, that frustrate the estate's ability to convert the economic value in leases into cash that can increase creditor recoveries.[92] But while section 365(f) can, and should, be used to invalidate provisions that frustrate those goals, a bankruptcy court nevertheless must be attentive to the facts of the particular case to ensure that section 365(f) is not used indiscriminately.

▉▉▉▉ Thus, while section 365(f) gives a bankruptcy court the clear power to invalidate provisions in leases assigned by debtors even when those provisions indirectly restrict the debtors' ability to assign the leases, a bankruptcy court retains discretion in determining whether a lease

---

91. The Court has considered the remaining arguments advanced by Stop & Shop and Ames and finds them to be without merit. They include Stop & Shop's contentions that Hannaford has failed to satisfactorily plead the continued operation of a "shopping center" on the "Entire Premises" (an argument inconsistent with modern pleading requirements); that the Court cannot decide the motion without further discovery (which would focus on the *Joshua Slocum* factors, which this Court has found are not germane); and Ames's contention that the Ames Lease could be sold free and clear of the Supermarket Restriction under Bankruptcy Code section 363(f). As Hannaford properly points out, none of section 363(f)'s enumerated bases for selling property free and clear of liens or interests has been satisfied.

92. As this Court stated in its earlier decision in Ames's chapter 11 case approving Ames's sale of designation rights:

In the bankruptcy context, Congress has provided that the value in a debtor's unexpired leases should enure for the benefit of all of a debtor's creditors, and has provided that subject to the procedural safeguards of the Code (principally in section 365), debtors may assume and assign their interests in leases even without lessor consent, and that notwithstanding any provisions in leases that prohibit, restrict, or condition the assignment of those leases, they may nevertheless be assigned. Using that power conferred under section 365 to assign leases even without lessor consent, debtor lessees can sell the lessee's interests in such leases to those willing to pay for them—converting, for their creditors, into the much more liquid asset of cash, the economic value in the leases.

*In re Ames Department Stores, Inc.*, 287 B.R. 112, 118–19 (Bankr.S.D.N.Y.2002) (Gerber, J.) (internal footnote reference to section 365(f) omitted).

provision hinders the possibility of assignment to a sufficient degree to render it unenforceable.[93] Sometimes such a provision will, and sometimes it will not:

> A court must examine the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment to the non-debtor party.[94]

In making such a determination, a court must consider the details of the proposed lease assumption and assignment to ensure that a proper balance is reached between the interests of the debtor-tenant and the economic detriment to the non-debtor.[95] Invalidation of a bargained-for element of a contract under section 365(f) plainly is permissible, but "the modification of a con-tracting party's rights is not to be taken lightly." [96]

The Court does not need to decide, and does not decide, whether provisions in deeded restrictions, like leases, are subject to invalidation under section 365(f) in appropriate cases.[97] For assuming, *arguendo*, that they are, the Court believes that the Supermarket Use Restriction nevertheless should not be invalidated here. The Supermarket Use Restriction here does not foreclose assignment, or result in a forfeiture of the leasehold for the Ames Store. It merely prohibits one of the many uses to which the Ames Store could be put. When a use provision is as limited as the one here, where its purpose and effect is to protect a neighboring business from a single prohibited use, and where, under the express provisions of the Code, it could not be invalidated if in a lease to which the Shopping Center amendments apply,[98] the Court believes that it would

---

93. *See In re E–Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 50 (Bankr.M.D.N.C.2003) ("[T]he court retains some discretion in determining whether a lease provision that does not explicitly prohibit assignment qualifies as a de facto anti-assignment clause thereby rendering it unenforceable.") (citing *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990); *In re Village Rathskeller, Inc.*, 147 B.R. 665, 672 (Bankr.S.D.N.Y.1992) (Brozman, C.J.); *In re Mr. Grocer, Inc.*, 77 B.R. 349, 355 (Bankr.D.N.H.1987) (Yacos, J.)).

94. *E–Z Serve Convenience Stores*, 289 B.R. at 50.

95. *Id.*

96. *Joshua Slocum*, 922 F.2d at 1091.

97. Ames's contentions here arise in a variant of the way this issue usually appears. The restriction on use here—prohibiting operation of a competing supermarket—is not in the lease, as it is in most of the cases considering the application of section 365(f). It is instead in a deeded restriction that is no less binding on Ames's landlord than it is on Ames as lessee. Accordingly, to the extent section 365(f) applies, it is because "applicable law"—New Hampshire state law—makes deeded restrictions enforceable.

98. Section 365(b)(3)(C) of the Code imposes requirements for providing adequate assurance of future performance for assumption when property is in a shopping center, which would include, among other things, showings that "assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center...." Similarly, section 365(b)(3)(D) requires a showing "that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center." Of course, for determining whether there is a "shopping center" within the meaning of section 365(b)(3), the *Joshua Slocum* standards *would* be applicable.

be inappropriate to invoke section 365(f) in the extraordinarily broad manner urged by Ames. Here, the uses to which the property can be put are not materially limited, and assignment to Stop & Shop (if for uses other than a supermarket) or to Stop & Shop's designee (for many uses other than a supermarket) is not foreclosed.

Cases cited by Ames do not hold to the contrary. In *U.L. Radio*,[99] the court struck down a use clause limiting the use of the property to the sale of television service or the sale of electrical appliances *only*.[100] Similarly, the leases invalidated in *Rickel Home Centers*[101] provided, variously, that they could be used only for a "Home Improvement Center" or a "typical Channel Home Improvement Center" (in the face of evidence that the "typical Channel Home Improvement Center" had either become obsolete, or was struggling to remain in existence, as a result of the advent of warehouse type home improvement stores like Home Depot) or, even that the store could be used only by a "Channel Home Center." [102] The practical prohibition of assignment in those cases was much more draconian than that here. In this case, since the Ames Store can still be used for many purposes other than the operation of a supermarket, the enforce-

ability of the Supermarket Use Restriction does not thwart the fundamental policy of maximizing estate assets for the benefit of all creditors.

Additionally, and as noted above, the harm to other, non-debtor, parties must be considered as well.[103] Here, the harm to Hannaford would be significant. If the Supermarket Use Restriction were invalidated, Stop & Shop would open a competing supermarket on the adjoining tract. The enforcement of the Supermarket Use Restriction would not interfere in a material way with the maximization of debtor Ames's assets. But invalidating the Supermarket Use Restriction would cause significant economic harm to Hannaford, and negate a bargained-for element in Hannaford's purchase of Tract # 2–A.

The Court concludes, accordingly, that section 365(f) cannot be used to prevent the enforcement of the Supermarket Use Restriction.

*Conclusion*

With the Court finding irrelevant to the Declaration's enforceability all of the allegedly material facts that Ames and Stop & Shop claim are disputed, Hannaford's motion for summary judgment is granted. The Court concludes that Hannaford is

---

**99.** *In re U.L. Radio Corp.,* 19 B.R. 537 (Bankr. S.D.N.Y.1982) (Galgay, J.).

**100.** *Id.* at 539.

**101.** Ames cited the Third Circuit decision in Rickel Home Centers, *L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers),* 209 F.3d 291 (3rd Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000), a mootness case that, in the course of its discussion, noted the importance of assignability in the context of a lower court's utilization of section 365(f). The more significant decision, however, is the decision below, that of District Judge Joseph Farnan (sitting as a bankruptcy court), in *In re Rickel Home Cen-*

*ters,* 240 B.R. 826, 830–832 (D.Del.1998), *app. dismissed,* 209 F.3d 291 (3rd Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000). The district court decision, with respect to which the Third Circuit dismissed the appeal, lays out the facts of that case in detail, and the reasons for which Judge Farnan invalidated the lease provisions there.

**102.** 240 B.R. at 831.

**103.** *See also U.L. Radio,* 19 B.R. at 545 (weighing the adverse effect on other tenants in the debtor's building as one of the factors to be weighed in determining the enforceability of a clause in an assigned lease).

entitled to judgment confirming the existence of the deeded restriction in the Declaration, and to judgment enforcing the Supermarket Restriction. Stop & Shop may not operate a supermarket on Tract # 2–B as long as Hannaford continues to operate a supermarket on Tract # 2–A.

Hannaford is to settle an order and judgment, on notice, in accordance with the foregoing. The time to appeal will of course run from the date of entry of that order and judgment, and not from the date of this decision.