**In re THREE A'S HOLDINGS, L.L.C., a Delaware limited liability company, et al.,[1] Debtors.**

**No. 06–10886 (BLS).**

United States Bankruptcy Court, D. Delaware.

March 5, 2007.

1. The Debtors are the following entities: Three A's Holdings, L.L.C., Jeremy's Holdings, LLC, Tower Direct LLC, 33rd Street Records, Incorporated, Pipernick Corp., M T S, Incorporated (d/b/a Tower Records), Columbus & Bay, Inc., and R.T. Records, Incorporated.

Christopher M. Samis, Jason M. Madron, Karen McKinley, Mark D. Collins, Mark A. Kurtz, Michael Joseph Merchant, Richards, Layton & Finger, P.A., Donna L. Culver, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, H. Nicholas Good-

man, Quirk & Bakalor, P.C., New York, NY, for Debtors.

### MEMORANDUM OPINION[2]

BRENDAN LINEHAN SHANNON, Bankruptcy Judge.

Before the Court is the Debtors' proposal to assume and assign an unexpired lease of nonresidential real property in Brea, California to Walgreen Co. (hereinafter, "Walgreens") in accordance with certain designation rights previously approved by the Court. The City of Brea (the "City") and the Brea Downtown Owners Association (the "BDOA", and collectively with the City, the "Objecting Parties") have objected, arguing that an assignment to Walgreens would violate both California state law and section 365(b)(3) of the Bankruptcy Code (the "Code"). To address both arguments, the parties acknowledge that this Court must decide a threshold issue: namely, whether the assumption and assignment of the lease to Walgreens violates certain enforceable restrictive use covenants governing commercial operations under the Lease.

For the reasons stated below, the Court concludes that the assumption and assignment will violate those restrictive use covenants, and thus, the Court will deny the Debtors' request to assume and assign the lease to Walgreens.

**BACKGROUND**

I. *Background*

Prior to seeking bankruptcy protection under chapter 11 of the Code on August 20, 2006, the Debtors operated a large and well-known specialty music and video business. On November 1, 1999, one of the Debtors, M T S, Incorporated (d/b/a Tower Records), entered into a lease (the "Lease") of nonresidential real property (the "Premises") with CIM/Superblocks, Inc.[3] to operate a Tower Records store in the Birch Street Promenade Shopping Center located in the City of Brea, California. The Birch Street Promenade Shopping Center is part of a "retail/mixed use project known as the Brea Downtown." Designation Rights Purchaser Ex. 3A ¶ A at 001672 (hereinafter, the "CC & Rs"). Brea Downtown was created in 1998 under California state law as a "common interest development". *See* CC & Rs, Attachment 8 ¶ 2.a. at 001735. *See generally* Davis–Stirling Common Interest Development Act, CAL. CIVIL. CODE §§ 1350–1378 (West 2007). It was created as a public/private initiative to redevelop twelve parcels of real property into an urban shopping district[4] with centralized management and oversight. *See generally* CC & Rs at 001672–001776; Nicoll Dep. 15:5–10, 28:16–21, 29:1–12, 30:9–18, Feb. 16, 2007.

In connection with the creation of Brea Downtown, the original developers and the

---

**2.** This Opinion constitutes the findings of facts and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

**3.** Subsequently, Cathedral Capital Partners, LLC ("Cathedral") became the owner and landlord of the Premises.

**4.** At the February 20, 2007 hearing, the parties essentially stipulated that Brea Downtown is a "shopping center". *See, e.g.,* Hr'g Tr. 17:20–18:16, 27:6, 46:25–49:17, Feb. 20, 2007. In light of the parties' consensus on

this point, the Court does not make an independent determination whether a multi-landlord, residential/commercial, non-contiguous shopping district is a "shopping center" for purposes of section 365(b)(3). *See In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1087–88 (3d Cir.1990) (articulating a multi-factor test for determining whether an entity is a "shopping center"); *see also In re Sun TV & Appliances, Inc.,* 234 B.R. 356, 360–70 (Bankr.D.Del. 1999) (applying the *Joshua Slocum* test to proposed assumption and assignment).

City entered into a Development Agreement (the "Development Agreement"). Subsequently, these parties formulated and recorded the Declaration of Covenants, Conditions and Restrictions for the Brea Downtown Owners Association (hereinafter, the "CC & Rs"), designed "to provide for the ongoing comprehensive marketing, enhanced levels of service, and property and assets management functions of the Brea Downtown...." Designation Rights Purchaser Ex. 11 at 001110 (Minutes from the BDOA's Board of Directors' Meeting on November 20, 2001); *accord* Designation Rights Purchaser Ex. 12 at 001100 (Minutes from the BDOA's Board of Directors' Meeting on January 15, 2002). Provisions within the CC & Rs address the various management concerns of Brea Downtown, including common parking, common area maintenance and improvements, trash removal, marketing, and permitted uses. *See generally* CC & Rs at 001672–001776. The parties have stipulated that, under California state law, the CC & Rs contain covenants that run with the land and are binding upon all owners, landlords, tenants, and their successors-in-interest. Hr'g Tr. 13:12–14, 30:17–19, 37:17–18, 49:8, 54:10–14, Feb. 20, 2007.

Although the Lease itself contains relatively few and discrete use restrictions, *see* Lease § 1.11, art. 5 § 5.1.1, Ex. B–4 [Docket No. 666], it is expressly subject to all of the specific use restrictions set forth in the CC & Rs, *see* Lease art. 1 § 1.5. Attachment 5 of the CC & Rs provides a schedule of approximately forty-six permitted uses (the "Permitted Uses"). *See* CC & Rs, Attachment 5 at 001720–001721. These are the only permissible uses of the properties within Brea Downtown. *See* CC & Rs art. VI § 6.1 at 001691 ("The Properties are expressly zoned and entitled to authorize residential and commercial retail and office development ... and

by this Declaration are further limited in use to certain specified purposes.... The permissible uses of the Properties are as set forth in Attachment No. 5."). Examples include antique shops, bakeries, bookstores, florists, health supplies, professional services, shoe repair, and cinemas. CC & Rs, Attachment 5 at 001720–001721. Of particular importance for the instant dispute is the notable absence of "drugstore" and "pharmacy" from the Attachment 5 schedule of Permitted Uses.

## II. *Procedural History*

Shortly after the commencement of the above-captioned case, pursuant to the Court's October 6, 2006 Order [Docket No. 365], the Debtors conducted store closing sales at certain retail store locations. Shortly thereafter, in accordance with a separate Order dated October 25, 2006 [Docket No. 443], the Debtors sold to Great American Group, LLC, Hudson Capital Group, LLC, Crystal Capital Fund, LP, and Retail Consulting Services, Inc. (collectively, the "Designation Rights Purchaser") the rights to designate whether a number of unexpired leases, including the lease at issue, would be rejected, assumed, and assigned in accordance with a Designation Rights Agreement. On November 17, 2006, the Debtors filed a Notice [Docket No. 601] proposing the assumption and assignment of the Lease to Walgreens, which subsequently announced its intention to operate the Premises as a retail drugstore and pharmacy.

Two parties objected to the Debtors' proposal. On November 27, 2006, Cathedral filed an objection [Docket No. 666] but has since settled with the Debtors. On January 4, 2007, the BDOA filed a letter objection [Docket No. 1010] with the Court voicing concern over Walgreens' proposed use and its effect on the tenant mix of Brea Downtown. Shortly thereaf-

ter, on February 13–14, 2007, the Objecting Parties filed a formal objection to the Debtors' Notice [Docket No. 1381] and commenced an adversary proceeding (Adv. Pro. No. 07–50730) seeking declaratory relief and a temporary restraining order [Docket No. 3] barring the proposed assignment to Walgreens. In support thereof, the Objecting Parties contend that, *inter alia*, Walgreens' proposed use of the Premises violates the restrictive use covenants contained in Attachment 5 of the CC & Rs, which do not include as permitted uses either a drugstore or a pharmacy. Consequently, according to the Objecting Parties, any assumption and assignment to Walgreens would violate both applicable California state real property law and section 365(b)(3) of the Code.

In support of the Debtors' proposal, on February 19, 2007, the Designation Rights Purchaser replied to the Objecting Parties [Docket No. 1112], arguing, *inter alia*, that only a landlord—not a municipality business district or an owners association—has standing to object to an assumption and assignment under section 365(b)(3) and that, even if the Objecting Parties did have standing, the CC & Rs do not expressly prohibit the use of the Premises as a drugstore or pharmacy. More specifically, they argue: (1) Attachment 5's Permitted Uses do not necessary render a drugstore or pharmacy a "prohibited use"; (2) Walgreens' proposed use falls under the Permitted Use of "Health Supplies"; (3) Walgreens' retail business engages in twenty-eight of the approximate forty-six Permitted Uses; and, finally, (4) the Objecting Parties have waived their right to enforce the CC & Rs after they permitted at least two businesses, which do not appear to fall into any of the Attachment 5 Permitted Uses, to operate at Brea Downtown. The Official Committee of Unsecured Creditors and the Debtors have joined in the reply of the Designation Rights Purchaser [Docket Nos. 1127 & 1113], and each supports the proposed assumption and assignment to Walgreens.

A hearing was held on February 20, 2007, at which time the Court heard oral argument from the Objecting Parties, the Designation Rights Purchaser, and Walgreens. The parties stipulated to the submission of four deposition transcripts and twenty-six exhibits and presented one live witness at the hearing.

This matter has been fully briefed and is ripe for decision.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (N), and (O).

## DISCUSSION

The Objecting Parties rely upon two legal bases to support their opposition to the Debtors' proposed assumption and assignment—California state law and section 365 of the Code. The Court will address each in turn as necessary.

I. *California State Law*

A. *Covenants Running With the Land*

■ Under California state law, certain restrictive covenants contained in deeds or other instruments conveying real property may "run with the land" so as to bind not only the original parties thereto but also their successors-in-interest. CAL. CIV.CODE §§ 1460, 1468; *see also* CAL. CIV.CODE § 1354. To do so, four requirements must be satisfied:

(a) The land ... which is to be affected by such covenants, and the land ... to be benefited, are particularly described

in the instrument containing such covenants;

(b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted ...;

(c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof, or if the land owned by or granted to each consists of undivided interests in the same parcel or parcels, the suspension of the right of partition or sale in lieu of partition for a period which is reasonable in relation to the purpose of the covenant;

(d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated.

CAL. CIV.CODE § 1468(a)-(d).

Here, the Declaration embodying the CC & Rs is the "operative document for the creation of [the Brea Downtown] common interest development [and consists of] a collection of covenants, conditions and servitudes that govern the project." *Nahrstedt v. Lakeside Village Condo. Ass'n, Inc.*, 33 Cal.Rptr.2d 63, 878 P.2d 1275, 1281 (1994); *see also* CAL. CIVIL. CODE § 1351(h) & 1353(a)(1). The use restrictions contained in Attachment 5 of the CC & Rs "are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement." *Nahrstedt*, 33 Cal.Rptr.2d 63, 878 P.2d at 1281. There is no dispute that the use restrictions set forth in Attachment 5 constitute covenants that run with the land. Hr'g Tr. 13:12–14, 30:17–19, 37:17–18, 49:8, 54:10–14; *see also* CC & Rs ¶ B at 001673 ("All and each of these covenants, conditions, and restrictions are hereby imposed as equitable servitudes upon the Properties, shall run with the Properties, and

shall be binding on all parties having or acquiring any right, title or interest in or to the Properties, ... and their successors and assigns. . . ."). Likewise, it is clear that the BDOA has standing to enforce the CC & Rs. *See* CC & Rs art. XIII § 13.5 at 001702 ("No Person, *other than an Owner, Declarant and the Association* shall have the right to enforce the provisions hereof." (emphasis added)); CAL. CIVIL. CODE § 1354 ("Unless the declaration states otherwise, [the covenants and restrictions set forth therein] may be enforced by any owner of a separate interest or by the association, or by both."); *accord Cutujian v. Benedict Hills Estates Ass'n*, 41 Cal.App.4th 1379, 49 Cal.Rptr.2d 166, 171 (1996).

Therefore, this Court can only approve the assumption and assignment of the Lease to Walgreens under California state law if its proposed use and primary business complies with the one or more of the approximate forty-six Permitted Uses set forth on Attachment 5 of the CC & Rs.

### B. *Satisfaction of the CC & Rs' Permitted Use Restrictions*

▇▇▇ Whether the CC & Rs and more specifically, Attachment 5, prohibit Walgreens from operating a drugstore and pharmacy on the Premises is a matter of contract interpretation governed by state law. *Chee v. Amanda Goldt Prop. Mgmt.*, 143 Cal.App.4th 1360, 50 Cal.Rptr.3d 40, 53 (2006). California state law controls this inquiry. *See* Lease art. 20 § 20.7 at 34 ("This Lease is governed by the laws of the State [of California]"). "The fundamental canon of interpreting written instruments is the ascertainment of the intent of the parties." *Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 177 Cal.App.3d 726, 223 Cal.Rptr. 175, 177 (1986). If the language of the instrument is "clear and explicit", the intent of the parties must be

inferred solely from the instrument's written provisions. *Id.* "Words in a written instrument are to be understood in their ordinary and popular sense." *Id.* at 179. If the language of the instrument is ambiguous, "extrinsic evidence as to the circumstances under which a written instrument was made has been held to be admissible in ascertaining the parties' expressed intentions...." *Cont'l Baking Co. v. Katz,* 68 Cal.2d 512, 67 Cal.Rptr. 761, 439 P.2d 889, 895 (1968).

■ The Designation Rights Purchaser has argued that the Permitted Use "Health Supplies" should be interpreted broadly to include Walgreens' proposed use. The Court disagrees. While Walgreens clearly sells merchandise that may be construed by the reasonable person as health supplies, such as vitamins, medical equipment, and personal care merchandise, its primary business is operating a retail pharmacy. Objecting Parties Ex. A at 3–4 (hereinafter, "Walgreens' 2006 10–K/A Report"). For the past three years, over sixty-three percent of Walgreens' net sales have been generated through prescription drug sales. Walgreens' 2006 10–K/A Report at 4.

While it is unclear from the wording of the CC & Rs whether the parties thereto intended "Health Supplies" to include a drugstore or a pharmacy, the testimony of several witnesses as well as the Development Agreement help this Court to ascertain that the Permitted Use of "Health Supplies" does not include a drugstore or pharmacy. First, prior to the creation of the CC & Rs, the original developers and the City entered into the Development Agreement, which set forth approximately forty permitted uses for Brea Downtown. Designation Rights Purchaser Ex. 19, Ex. C at 1–2. Included in those permitted uses were "Drugstore" and "Pharmacy". Designation Rights Purchaser Ex. 19, Ex. C at 1–2. When the CC & Rs were formulated several months later, those same parties revised the Permitted Uses to omit "Drugstore" and "Pharmacy". The testimony reflects that this omission was not unintentional. According to James L. Markman, attorney for the City and the Brea Development Agency (the "Agency") who participated in the negotiation and drafting of the CC & Rs, the omission of "Drugstore" and "Pharmacy" from Attachment 5 was a very specific and intentional exclusion negotiated by the City. Markman Dep. 25:8–23, Feb. 19, 2007. Additionally, Mr. Markman testified that his understanding of the term "Health Supplies" did not contemplate prescription drugs or the operation of a pharmacy. Markman Dep. 49:24–50:2; *see also* Nicoll Dep. 68:17–69:8, Feb. 16, 2007 (statement of Eric Nicoll, who has served as the Director of the Economic Development Department for the City, the Deputy Executive Director for the Agency, and the city representative for the BDOA, that "Health Supplies" contemplated a vitamin store). If the drafting parties wanted to include "Pharmacy" as a Permitted Use, they would not have omitted it from Attachment 5. Because the record indicates that "Health Supplies" does not contemplate operation of a drugstore or pharmacy, this Court will not broadly expand that Permitted Use to include Walgreens' proposed use.

■ In further support of the Debtors' proposal, the Designation Rights Purchaser argues that Walgreens' retail business engages in twenty-eight of the approximately forty-six Permitted Uses set forth on Attachment 5. Merchandise sales at Walgreens include baked goods, books, cameras, photo supplies, toys, photo processing, and art supplies. Hr'g Tr. 19:12–19. However, for the past three years, these "Front-end Sales" have only accounted for approximately thirty-five percent of

Walgreens' total net sales. Walgreens' 2006 10–K/A Report at 4. The remainder were generated from prescription drug sales, leading this Court to conclude Walgreens' primary business is operating a pharmacy. Moreover, the schedule on Attachment 5 is not an aggregative list. In other words, either a tenant's primary business is or is not permitted. As such, Walgreens' cannot dissect its merchandise sales by category to achieve compliance with Attachment 5.

▪ The Designation Rights Purchaser asserts that, even if this Court concludes that Walgreens' proposed use violates the Permitted Use restrictions on Attachment 5, the Objecting Parties have waived their rights to enforce the CC & Rs. More specifically, the Designation Rights Purchaser points to two businesses permitted to operate in Brea Downtown, a comedy club and a photography studio, which it contends do not fall into any of the Attachment 5 Permitted Uses. Additionally, it points to two businesses operating on the ground floor of Brea Downtown, Supercuts and Star Nails, despite the provisions within the CC & Rs permitting "day spas" and "hair salons" to operate solely on the upper floors. *See* CC & Rs, Attachment 5 at 001720–001721.

▪ First, the Court disagrees with the Designation Rights Purchaser's view that the comedy club is in violation of Attachment 5. In reaching its conclusion, the Court is mindful of California state law, which conveys onto owners associations discretionary decision-making authority when enforcing use restrictions. *See Nahrstedt*, 8 Cal.4th at 374, 33 Cal. Rptr.2d 63, 878 P.2d at 1282 ("Generally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with

the development's governing documents, and comply with public policy."); *accord Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n*, 21 Cal.4th 249, 87 Cal.Rptr.2d 237, 980 P.2d 940, 949 (1999); *see also* CAL. CIVIL CODE § 1370 ("Any . . . declaration . . . for a common interest development shall be liberally construed to facilitate the operation of the common interest development . . . .").

With respect to the Improv Comedy Club, it is the testimony of Messrs. Nicoll and Markman that the business falls under the Permitted Use categories of "Food— On & Off Site" and "Liquor—On & Off Site". Nicoll Dep. 61:3–62:20; Markman Dep. 28:18–29:11, 36:25–37:4; CC & Rs, Attachment 5 at 001720–001721. The Court agrees. The comedy club may use comedic entertainment to attract patrons, but this does not render its primary business a prohibited use.

With respect to LaNeve Photography ("LaNeve"), a fine art photography and portrait business, the Objecting Parties, supported by the testimony of Messrs. Nicoll and Markman, have argued that it operates a business within the Permitted Use categories of "Specialty Shops" or "Professional Services". Nicoll Dep. 71:2–73:9; Markman Dep. 71:22–72:2; Hr'g Tr. 34:9–11. The issue of whether LaNeve's business falls within the categories of "Specialty Shops" or "Professional Services" is admittedly a more difficult question than that concerning the Improv Comedy Club. LaNeve offers not only family, individual, wedding, and pet photography but it also specializes in commercial and school photography. Designation Rights Purchaser Ex. 5 at 2. While there is no specific definition of "Specialty Shops" or "Professional Services" within the CC & Rs, it is likely that an ordinary person would find that LaNeve's business falls into those categories.

However, even if LaNeve's business, as well as Supercuts and Star Nails, do not fall within the Permitted Uses set forth on Attachment 5, the Objecting Parties did not waive forever their right to object to future violations of Attachment 5. Under California state law, "one or a few waivers will not suffice. There must be a sufficient number of waivers so that the purpose of the general plan is undermined." *Kapner v. Meadowlark Ranch Ass'n,* 116 Cal. App.4th 1182, 11 Cal.Rptr.3d 138, 144 (2004). Here, the minor violations alleged to have been permitted by the BDOA could not possibly undermine the general plan of Brea Downtown.

Finally, the Designation Rights Purchaser has asserted that Attachment 5 does not necessarily render a drugstore or pharmacy a "prohibited use" since it merely establishes "permitted uses". Indeed, in the Court's experience, the circumstances of this case are unusual. Typically, cases regarding use restrictions involve explicit prohibitions or restrictions within a lease or related document. *See, e.g., Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 316 B.R. 772, 778 (Bankr.S.D.N.Y.2004) (seeking to enforce a covenant expressly prohibiting the operation of a competing supermarket). However, as noted above, section 6.1 of the CC & Rs makes it clear that the Permitted Uses on Attachment 5 are the only permissible uses of the properties within Brea Downtown. *See* CC & Rs art. VI § 6.1 at 001691 ("The Properties are expressly zoned and entitled to authorize residential and commercial retail and office development ... and by this Declaration are further limited in use to certain specified purposes.... The permissible uses of the Properties are as set forth in Attachment No. 5."). To allow Walgreens to conduct a business that is not a "Permitted Use", simply because it is not affirmatively prohibited in the CC & Rs, would render

Attachment 5 and section 6.1 of the CC & Rs a nullity. *See Ticor,* 223 Cal.Rptr. at 177 ("A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach.' If possible, the court should give effect to every provision. An interpretation which renders part of the instrument to be surplusage should be avoided." (internal citations omitted)); *see also Dyna–Med, Inc. v. Fair Employment & Hous. Comm'n,* 43 Cal.3d 1379, 241 Cal.Rptr. 67, 743 P.2d 1323, 1329 (1987) ("expressio unius est exclusio alterius").

Therefore, for the reasons set forth above, the Court concludes that Walgreens' proposed use of the Premises as a drugstore and pharmacy violates the restrictive use covenants set forth in Attachment 5 of the CC & Rs.

This determination does not end the inquiry. Having reviewed state law and the CC & Rs, the Court must now turn to the Bankruptcy Code and determine whether the use restrictions in the CC & Rs operate to bar the assumption and assignment under section 365 of the Bankruptcy Code.

## II. *Section 365 of the Bankruptcy Code*

Section 365 governs the assumption and assignment of a debtor's unexpired leases. As a general proposition, for a debtor to obtain court authority to assume and assign a lease, it must only provide adequate assurance that the proposed assignee will perform in accordance with the lease terms. *Joshua Slocum,* 922 F.2d at 1086. If this requirement is satisfied, section 365(f)(1) affords the Court discretion to void or override lease provisions that constitute unreasonable restrictions on transfer, with the purpose of allowing a debtor to maximize value of estate property. *In re Rickel Home Cen-*

*ters, Inc.,* 240 B.R. 826, 831–32 (D.Del. 1998).

■ Although the Court has broad authority under section 365(f)(1) to authorize the assumption or assignment of leases in violation of their terms, this discretion is severely constrained if the assumption or assignment involves a lease of real property in a shopping center. In 1984, Congress provided for heightened restrictions in section 365(b)(3) to provide a framework for enforcing common provisions found in shopping center leases. *See* 11 U.S.C. § 365(b)(3). The legislative intent behind the so-called "Shopping Center Amendments" is clear:

> to protect the rights of lessors and the center's other tenants. Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular the center's other tenants.

*Joshua Slocum,* 922 F.2d at 1085 (internal citations omitted).

Section 365(b)(3) provides, in pertinent part:

> For the purposes of … *subsection (f),*[5] adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

. . . .

> (C) *that assumption or assignment of such lease is subject to all the provisions thereof, including* (but not limited to) provisions such as a radius, location, *use,* or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

> (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(A)-(D) (emphasis added).

■ Here, the parties do not dispute that Brea Downtown is a shopping center. *See supra* note 4. Therefore, similar to the foregoing analysis under California state law, this Court can only approve the assumption and assignment of the Lease to Walgreens if its proposed use does not violate the use restrictions set forth in Attachment 5 of the CC & Rs.[6] The Court has already concluded that Walgreens' proposed use violates the restrictive use covenants set forth in Attachment 5 of the CC & Rs. Therefore, any assumption and assignment of the Lease to Walgreens would be foreclosed by section 365(b)(3)(C). The Objecting Parties argue that any assumption and assignment to Walgreens is not permitted by section 365(b)(3) of the Code, and the Court agrees.

---

**5.** The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (2005), further constrained the Court's ability to authorize assumption or assignment of shopping center leases in violation of the terms of such leases by expressly subjecting section 365(f)(1) to the provisions of section 365(b)(3).

**6.** The parties have thoroughly briefed and argued whether, pursuant to section 365(b)(3)(D), the assumption and assignment of the Lease will or will not disrupt any tenant mix or balance in Brea Downtown. Because the Court has concluded that the proposed assumption and assignment violates section 365(b)(3)(C), it is unnecessary for the Court to reach this issue.

█ The Designation Rights Purchaser has argued that only a landlord has standing to object to a proposed assumption and assignment under section 365(b)(3). The Court acknowledges that the primary thrust of section 365(b)(3) appears to be to protect a landlord's ability to collect rent and perform its obligations to other shopping center tenants. *See Trak Auto Corp. v. W. Town Center LLC (In re Trak Auto Corp.)*, 367 F.3d 237, 242–43 (4th Cir.2004) (describing in great detail the legislative history behind section 365(b)(3)). Neither the City nor the BDOA is the landlord of the Premises, although the BDOA performs many (if not most) of the functions that would be expected of a shopping center landlord through the CC & Rs, including arranging for common parking, trash removal, maintenance, and joint marketing. *See generally* CC & Rs at 001672–001776.

The Court has already noted that the BDOA has standing, under the CC & Rs and California state law, to enforce the use restrictions set forth in section 6.1 and Attachment 5 of the CC & Rs. *See* CC & Rs art. XIII § 13.5 at 001702; Cal. Civil. Code § 1354. Further, section 1109 of the Code confers upon "part[ies] in interest" the right "to appear and be heard on any issue in a case under [Chapter 11]." 11 U.S.C. § 1109(b). The Code does not define "party in interest" but the language of the statute and relevant treatises suggest that the term should be broadly construed and liberally applied. *See generally* 7 Collier on Bankruptcy ¶ 1109.2[1] (Alan N. Resnick et al. eds., 15th ed. rev.2006). At bottom, principles of standing contemplate "limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's rights, ... and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

Typically, the issue of standing to object, in the shopping center context, arises where another tenant seeks to enforce restrictions contained in a lease between a debtor and a landlord. *See, e.g., S. Boulevard, Inc. v. Martin Paint Stores (In re Martin)*, 207 B.R. 57, 59–60 (S.D.N.Y. 1997) (non-debtor tenant lacked standing to enforce use restrictions in debtor's lease). In the present case, however, the BDOA does not seek to enforce restrictions in the Tower/Cathedral Lease, to which it is not a party, but rather to require compliance with duly recorded restrictive covenants which explicitly empower it to enforce. *See* CC & Rs art. XIII § 13.5 at 001702. Thus, the BDOA is not seeking to raise another party's rights, but rather itself possesses the right to appear and be heard in opposition to the proposed assumption and assignment to Walgreens and to demand compliance with the adequate assurance requirements of section 365(b)(3)(C). *See Ames*, 316 B.R. at 783–84 (finding non-debtor tenant had standing to bar lease assignment in violation of use restriction in recorded covenants).

Because the BDOA has standing to press its objection, and the Court having ruled that the proposed assumption and assignment would violate the use restrictions contained in the CC & Rs, the request of the Debtors and the Designation Rights Purchaser for authority to assume and assign the Lease to Walgreens will be denied.

### *CONCLUSION*

For the foregoing reasons, the Court concludes that Walgreens' proposed use of the Premises as a drugstore and pharmacy violates the restrictive use covenants set forth in Attachment 5 of the CC & Rs, compliance with which is mandated by the

adequate assurance requirements of section 365(b)(3)(C). Therefore, the Lease may not be assumed and assigned to Walgreens under California state law and under the Bankruptcy Code. The Court will deny the Debtors' request. As a result, the Objecting Parties' motion for a temporary restraining order [Adv. Pro. No. 07–50730, Docket No. 3] is denied as moot.

An appropriate Order follows.